IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| THE HALE FOUNDATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action Number: _____ |
| | ) | |
| AUGUSTA, GEORGIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff The Hale Foundation, Inc. ("Hale Foundation"), by and through its undersigned counsel, files this complaint against Augusta, Georgia ("Augusta" or "Defendant") alleging as follows:

## I.    NATURE OF THIS ACTION

1.    First responders are at the forefront of public disruptions and disasters, and they ensure the safety and well-being of the population. They are, however, exposed to traumatic situations that pose risk of harm to them or the people under their care. This exposure can negatively impact the behavioral health of first responders, putting them at risk for stress, PTSD, depression, substance use, and suicide ideation and attempts.

2.    It is estimated that first responders develop behavioral health conditions including, but not limited to, depression, addiction, and posttraumatic stress disorder at a rate that is 50% higher than the general population.  *See* SAMHSA, Disaster Technical Assistance Center Supplemental Research Bulletin: First Responders: Behavioral Health Concerns, Emergency Response, and Trauma May 2018 (available at

https://www.samhsa.gov/sites/default/files/dtac/supplementalresearchbulletin-firstresponders-may2018.pdf, last visited 10/6/20).

3.     PTSD and depression rates among firefighters and police officers have been found to be as much as five times higher than the rates within the civilian population, which causes first responders to commit suicide at a considerably higher rate than the general public. *See* Study: Police Officers and Firefighters Are More Likely to Die by Suicide than in Line of Duty, available at  https://rudermanfoundation.org/white_papers/police-officers-and-firefighters-are-more-likely-to-die-by-suicide-than-in-line-of-duty/ (last visited 10-6-20).

4.     One survey shows that first responders are ten times more likely to contemplate suicide and attempt suicide than the general public.  *See* Abbot, C., Barber, E., Burke, B., Harvey, J., Newland, C., Rose, M., & Young, A. (2015). What's killing our medics? Ambulance Service Manager Program. Conifer, CO: Reviving Responders. Retrieved from http://www.revivingresponders.com/originalpaper (last visited  10/6/20).

5.     Plaintiff brings this action under the Fair Housing Act, 42 U.S.C. § 3601 ("FHA"), the Americans with Disabilities Act, 42 U.S.C. § 12102 ("ADA"), the Rehabilitation Act, 29 U.S.C. § 791, the Fifth and Fourteenth Amendments to the United States Constitution, and state zoning law.

6.     This action arises out of the unlawful acts of Defendant to deprive Plaintiff of a special exception permit to develop a rehabilitation center for first responders ("rehabilitation center") on a 20-acre site located in Augusta, Georgia at 3042 Eagle Drive (the "Property").  The rehabilitation center would assist first responders who are in need of treatment mental health and substance use (behavioral health) concerns, usually associated with their professional duties.

7.      The Property is a 20-acre site with buildings and dormitories designed to serve as residences for up to 30 people.  The Property was originally not subject to zoning laws, and it was used by a convent by the Order of St. Helena Convent for over 40 years until they moved from the Property to North Augusta in approximately 2014.  After sitting for many years on the market, the property was sold in October of 2017 to the Hale Foundation.

8.      The former convent, shown below, is contained within 20 acres of forest and is bounded to the south by Bobby Jones Expressway, to the West by Augusta Technical College, to the east by the Green Meadows golf course, and to the north by the Green Meadows subdivision. It is ideally suited for Plaintiff's proposed rehabilitation center.



9.     The Property already contains the dormitories and commercial kitchen facilities to support the mission of the Hale Foundation.  Since the nuns vacated the Property, the only proposed uses for it have been (a) a monastery, (b) a rehabilitation center for troubled youth, and (c) the Hale Foundation's proposed rehabilitation center.  The Property is not suited for single family use.

10.     The Hale Foundation fully demonstrated that the proposed rehabilitation center was similar to the special exceptions already authorized and permitted by Augusta. To the extent the Ordinance did not already permit Plaintiff's proposed rehabilitation center, Plaintiff satisfied all of the established criteria set forth in the applicable Ordinance for a special exception, but Defendant denied the special exception and failed to make any reasonable accommodation for the proposed facility.

11.     Defendant's denial of Plaintiff's application constitutes unlawful discrimination under the FHA, ADA, and Rehabilitation Act, and violates Georgia zoning laws and the United States Constitution. Defendant's illegal discrimination was blatant and was clearly established in the public hearing transcripts. It was rooted in the all-too-common ignorance and prejudice of those who refuse to permit substance abuse treatment in their communities based upon illegal and discriminatory stereotypes about those seeking to recover from addiction.

12.     This "not in my back yard" (or "NIMBY") mentality is not only illegal, but it perpetuates the growing public health problem posed by what has become a public epidemic of drug and alcohol addiction in the United States. The NIMBY mentality also causes lasting harm by depriving addicts of viable rehabilitation treatment centers, increasing deaths and serious injuries, and unlawfully prohibiting willing caretakers from carrying out their plans to combat addiction.

13.     In the course of denying Plaintiff a special exception permit on two separate occasions on the clearly discriminatory and unlawful basis that the facility would house recovering addicts, Defendant burdened Hale Foundation with almost two years of proceedings before the Augusta Department of Planning and Development, the Augusta-Richmond County Planning Commission, and the Augusta Commission.

14.     On June 29, 2018, Hale Foundation applied for a special exception under Section 26-1 of the Comprehensive Zoning Ordinance of Augusta, Georgia.  It completed the entire process and met all requirements of the Augusta Planning Department, the Augusta-Richmond County Planning Commission, and the Commission, but it did not receive a special exception to use the Property.

15.     It proposed to wall off the Property from the nearby subdivision and obtain access exclusively though the adjacent roadway associated with the Augusta Technical College roadway. A public hearing was held in front of the public service commission on August 6, 2018.  Members of the Green Meadows neighborhood appeared and objected to the proposed use for a rehabilitation center based upon a perceived notion that the proposed Property use would create safety and security problems and decrease their property values.  The argument was based solely upon the protected status of The Hale Foundation clientele as drug or alcohol addicts.  That is tantamount to stating that if persons of a specific race moved into the Property, then their use would create safety and security problems and decrease their property values.  For purposes of the law, there is no difference between objecting to one's race or one's protected health status.

16.     At the public hearings, the Green Meadows neighborhood played a video for the Commissioners to view in which they provided statements such as the following:

- "I would feel very unsafe to know that there were people in the neighborhood that we are not used to having in the neighborhood."

- "We have that sense of peace here … If a different entity was to come into our neighborhood, it is not going to provide that safety and that serenity and all of that anymore."

- "When we heard that this half-way house was coming up here, something jolted us."

- "We could wake up in the middle of the night and find them sitting on our porch ... We could wake up any morning and maybe find them swimming in our swimming pool."

- "My worst nightmare is knowing that a drug rehab center is coming in my neighborhood."

- "It's safe over here.  We don't want that over here."

- "I don't like the idea of a drug rehab center being in our neighborhood."

- "The peace safety and serenity that I feel now is going to diminish."

- "Don't let these people move in here."

- "We don't need a half-way house here in our neighborhood."

- "We all want to have a peace of mine, safety, serenity in our own neighborhood."

17.    On March 4, 2019, a public meeting was held before the Augusta-Richmond County Planning Commission, where the 2018 Application for Special Exception was discussed. The Planning Commission at that time recommended the denial of the Special Exception Application because the Petitioner did not yet have a right of access through the Augusta Technical College roadway.

18.    On March 19, 2019, the Augusta Commission held a meeting to discuss the 2018 Application for Special Exception, but a decision was made to continue the matter to a special meeting on April 30, 2019.

19.     On April 30, 2019, the Augusta Commission held a special meeting to discuss the 2018 Application for Special Exception. The Commission voted 5-4 to approve a motion to allow the Special Exception.   However, six votes are required to approve the special exception, and Commissioner Ben Hasan abstained from voting. A separate motion was made to "uphold" the recommendation of the Planning Commission, but that vote failed with 6 commissioners voting not to uphold it and 4 voting to do so.

20.     The result was "no action" by the Commission since six votes are required to affirmatively approve the special exception.  The attorney for the Commission announced that the matter was "disposed" of and any further pursuit of the special exception would require a new application by the Petitioner.  Following such a "no action" vote, the Petitioner's application was not scheduled to be reheard, and its only recourse was to appeal or start over with a new special exception application process.  As true and accurate copy of the documents pertaining to the First Application are attached hereto as Exhibit "A."

21.     The Petitioner properly filed a Second Application for Special Exception with the Augusta Planning Department on or about November 27, 2019, and it submitted all documentation required by the Planning Department.  A true and correct copy of the Petitioner's Special Exception Application is attached hereto as Exhibit "B" (the "Special Exception Application").

22.     This time, the Petitioner's Special Exception Application was presented to and approved by the 10-person Planning Commission on or about August 3, 2020, with the following stipulations:

    a.  The Special Exception for this property is for an alcohol, drug and post-traumatic stress disorder treatment facility for first responders only. If the clientele or

treatment program changes, the applicant/owner must apply for a new Special Exception.

b.  Final approval of this project is contingent on obtaining an easement, in writing, from the State of Georgia to provide driveway access to the property from Augusta Tech Drive. All egress and ingress to this property is to be through this driveway.

c.  A privacy fence consisting of solid wood board six feet in height shall be installed along the east boundary line of the property at Augusta Tech Drive to head south +/- 1,772 feet to Eagle Drive, continue across Eagle Drive and follow the southern property boundary along 3038 Eagle Drive, 3040 Eagle Drive and 2900 Green Meadows Drive. Access from Eagle Drive is for emergencies only. A 50-foot vegetative buffer shall be installed along the fence line except where emergency access is provided.

d.  Any expansion, additions or alterations to the property must comply with all development standards and regulations set forth by the City of Augusta, and must receive site plan approval prior to any changes.

A true and accurate copy of the Planning Commission's Approval is attached hereto as <u>Exhibit "C."</u>

23.     At the August 3, 2020 public hearing before the Planning Commission, residents of the Green Meadows neighborhood attended to voice opposition to the Petitioner's Special Exception Application. Their objections focused entirely on the discriminatory opposition to the medical condition of the proposed residents of the Property and the wholly unfounded concerns about a potential increase in crime and decrease in property values.

24.     The Petitioner's Application for Rezoning was on the public notice and agenda before the Augusta Commission on August 18, 2020.  Again, the same neighbors appeared to object to the Special Exception Application, and they made similar presentations focused on the medical condition of the proposed residents of the Property and wholly unfounded concerns about a potential increase in crime.

25.     An initial vote was held on the motion of Brandon Garrett to confirm the approval of the special exception by the Augusta-Richmond County Planning Commission.  Voting in favor of the special exception for the Petition were commissioners Brandon Garrett, Mary Davis, Sean Frantom, John Clarke and Marion Williams. Commissioner Williams Fennoy abstained and prevented Mayor Hardie Davis, Jr., from potentially breaking a 5-5 tie. The vote was 5-4-1 in favor of confirmation of the approval, but six votes are required to carry the vote.  A subsequent motion to deny Petitioner's application also failed along the same lines with Commissioner Fennoy again abstaining.   A copy of the Commission's action is attached hereto as Exhibit "D."   The Commissions position is again that this "no action vote" disposes of the matter, and the Hale Foundation must start over with a new application in order to obtain a special exception.

## II.     THE PARTIES

26.     Plaintiff Hale Foundation is a Georgia nonprofit corporation.   The Hale Foundation's mission is to serve people suffering from substance abuse regardless of age, race, religion, ethnicity, or national origin. Its objective is to help individuals recover from alcohol and drug abuse and return them to society as productive members.

27.     In 1990, two Augusta businessmen, Sam Sibley and Hampton Walker, formed Hale Foundation to establish a recovery residence for adult men challenged with alcoholism and drug

addiction. What started with a single house and one recovery residence tenant has grown to five houses and 48 residents.

28.     The Hale Foundation uses a proven program, which combines education and adherence to the 12-step program within a supportive residential environment. Each person who completes the program is returned to society sober, independent and ready to assume the responsibilities of employment and family relationships.

29.     With respect to the Property at issue here, the Hale Foundation seeks to create a clinic for <u>voluntary</u> admission by first responders seeking drug and alcohol treatment.  It would be a residential treatment facility that only accepts voluntary participants who are not presently consuming drugs or alcohol and are not ordered to be at the facility by any Court.

30.     Defendant Augusta, Georgia, is a consolidated Georgia municipal corporation and county.  Augusta acts on zoning matters such as this one through its Commission based upon recommendations of the Augusta-Richmond County Planning Commission.

31.     The Augusta Commission is a legislative body of Augusta and is vested with authority under the Augusta zoning ordinance to, among other things, approve or deny applications for a special exception within Augusta.

## III.     <u>JURISDICTION AND VENUE</u>

32.     This Court has jurisdiction over Plaintiff's federal law claims under 28 U.S.C. §§ 1331 and 1343, and over Plaintiff's state law claims under 28 U.S.C. § 1367.

33.     Venue is proper here under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendant is a resident of this judicial district, the events or omissions giving rise to the claims set forth herein occurred in this judicial district, and the property that is the subject of this action is situated in this judicial district.

## IV.   FACTUAL BACKGROUND

### Drug and Alcohol Abuse is a Public Health Epidemic

34.    Drug and alcohol abuse is a nationwide public health epidemic. Drug overdose deaths surpass deaths from gun homicides and traffic accidents combined. This public health epidemic has been widely acknowledged across the country, and hardly a day passes that does not see new reports of communities that have been devastated by the health consequences of drug and alcohol abuse.

35.    The Comprehensive Addiction and Recovery Act of 2016 recognized the abuse of heroin and prescription opioid painkillers as having "a devastating effect on public health and safety in communities across the United States." Comprehensive Addiction and Recovery Act of 2016, S. 524, 114th Cong., § 2.

36.    More recently, in 2017 the United States President's Commission on Combating Drug Addiction and the Opioid Crisis issued a report in which it warned:

> According to the Centers for Disease Control (CDC), the most recent data estimates that 142 Americans die every day from a drug overdose. Our citizens are dying. We must act boldly to stop it. The Opioid epidemic we are facing is unparalleled. The average American would likely be shocked to know that drug overdoses now kill more people than gun homicides and car crashes combined. In fact, between 1999 and 2015, more than 560,000 people in this country died due to drug overdoses – this is a death toll larger than the entire population of Atlanta.

(Available at:  https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf  (last visited October 5, 2020)). The Commission urged the President to declare a national emergency.

37.    In addition, the Commission found that one of the largest obstacles to stemming the epidemic was a lack of treatment facilities. As it now stands, the Commission noted, "only 10

percent of the nearly 21 million citizens with a substance abuse disorder receive any type of specialty treatment according to the most recent National Survey on Drug Use and Health."

38.    Overdose is now the leading cause of death in Americans under the age of 50.  From 2010 to 2017, the total number of opioid-related overdose deaths in Georgia increased by 245 percent.

39.    In October 2017, the President declared the opioid crisis a national public health emergency, and in Georgia, almost two-thirds of drug overdose deaths were attributed to opioids— 1,043 total.

40.    Despite the fact that substance abuse and addiction are on the rise, there are an insufficient number of residential treatment beds available to potential patients.  This is in part due to the long and continuing history of discrimination against people with substance use disorders, including discriminatory zoning laws and decisions that operate as a barrier to providers seeking to open or expand substance use disorder treatment programs.

41.    Augusta has experienced the devastating effects of the country's opioid crisis. In 2018, Augusta filed a lawsuit against the manufacturers and wholesale distributors of prescription opioids.  Augusta alleged that the manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. It asserted that pharmaceutical companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, which turned patients into drug addicts for their own corporate profit. It also asserted that distributors and manufacturers intentionally and/or unlawfully breached their legal duties under federal and state law to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates.  A true and accurate copy of the Complaint is attached hereto as Exhibit "E."

42.     In that Complaint, Augusta asserted that from 2009 to 2014, Georgia had the highest percentage change in the rate of opioid-related inpatient stays of any state, at 99.8 percent. Georgia also had the third highest cumulative percent increase (85.2 percent) in the rate of opioid-related emergency department visits. (See Exhibit E ¶ 63).

43.     According to the Defendant Augusta, the opioid epidemic has been particularly devastating in this County with opioid-related overdoses increasing from just 3 in 2013 to 34 in 2016. In 2017, at least 41 deaths were caused by drugs, with opioids accounting for 24 of those deaths. (Compl., Ex. E ¶ 66).

44.     According to the Defendant, in this County the opioid prescribing rates, as reported by the CDC, are consistently above the national averages – which are themselves too high – and in some years there were more opioid prescriptions dispensed than persons in Augusta.

   a.   In 2016, compared to the national average of 66.5 opioid prescriptions dispensed per 100 persons, the County rate was 86.8.

   b.   Compared to the national average of 70.6 opioid prescriptions per 100 persons in 2015, the Augusta rate was 92.9.

   c.   In 2014, compared to the national average of 75.6 prescriptions per 100 persons, the Augusta rate was 102.

   d.   Compared to the national average of 78.1 prescriptions per 100 persons in 2013, the Augusta rate was107.5.

   e.   In 2012, compared to the national average of 81.3 prescriptions per 100 persons, the Augusta rate was 110.4.

   f.   Compared to the national average of 80.9 prescriptions per 100 persons in 2011, the Augusta rate was 107.8.

g.  Augusta rates of opioid prescriptions per 100 persons in prior years also exceeded the national average and the number of persons in Augusta: 107.4 in 2010, 104.8 prescriptions per 100 people in 2009, and 100.4 in 2008.

45.  Augusta asserted that the opioid epidemic has placed increased budgetary constraints upon the public health and medical care expenditures of the State and Plaintiff's Community.  It asserted that opioid addiction is one of the primary reasons citizens of Augusta seek substance abuse treatment. (Compl., Ex. E ¶ 69).

46.  Augusta claims that opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in Augusta, and they constitute temporary and continuing public nuisances, which remain unabated. (Compl., Ex. E ¶ 70).

47.  Because of a shortage of beds in dedicated drug treatment facilities, many patients end up in hospital emergency rooms for detoxification. This in turn causes unnecessary expense to the patient and to the community, an unnecessary strain on first responders, who are commonly required to transport patients 60-90 miles to find a bed at a facility capable of medically managed detoxification, and on hospitals, which must find space and medical staff to treat these patients.

48.  Detoxification in a hospital setting is often less effective than care at many residential treatment facilities, which are, unlike hospitals, able to offer a continuum of care that extends well beyond a typical hospital stay.

49.  A skyrocketing number of people suffering from addiction in Augusta and elsewhere need treatment and are unable to get it, particularly in a residential facility.

50.  Defendant's denial of Plaintiff's application perpetuates this growing problem and irreparably harms those persons in desperate need of treatment.  It also stands in stark contrast to the complaint it has filed against opioid manufacturers and distributers, wherein it complains and

alleges that drug addiction is a "continuing public nuisance, which remains unabated." Plaintiff seeks to assist in abating that nuisance.

51.     This problem is particularly felt by first responders who are at a higher risk of developing behavioral health conditions due to repeated exposure to high-stress, life-threatening situations coupled with long hours and an insular culture. *See* Police and Addiction: Officers are nearly three times as likely to suffer from addiction as others, available at https://www.psychologytoday.com/us/blog/sure-recovery/201803/police-and-addiction (last visited 10-6-2020) ("Between 7% and 19% of police officers have symptoms of post-traumatic stress disorder, as compared to 3.5% in the general population.").

52.     It is estimated that first responders develop behavioral health conditions including, but not limited to, depression and posttraumatic stress disorder at a rate that is 50% higher than the general population. *See* SAMHSA, Disaster Technical Assistance Center Supplemental Research Bulletin: First Responders: Behavioral Health Concerns, Emergency Response, and Trauma May 2018  (available at https://www.samhsa.gov/sites/default/files/dtac/supplementalresearchbulletin-firstresponders-may2018.pdf, last visited 10/6/20).

53.     PTSD and depression rates among firefighters and police officers have been found to be as much as five times higher than the rates within the civilian population, which causes first responders to commit suicide at a considerably higher rate than the general public. Study: Police Officers and Firefighters Are More Likely to Die by Suicide than in Line of Duty, available at https://rudermanfoundation.org/white_papers/police-officers-and-firefighters-are-more-likely-to-die-by-suicide-than-in-line-of-duty/ (last visited 10-6-20).

54.     One survey shows that first responders are ten times more likely to contemplate suicide and attempt suicide than the general public. Abbot, C., Barber, E., Burke, B., Harvey, J.,

Newland, C., Rose, M., & Young, A. (2015). What's killing our medics? Ambulance Service Manager Program. Conifer, CO: Reviving Responders. Retrieved from http://www.revivingresponders.com/originalpaper (last visited  10/6/20).

55.     Plaintiff seeks to provide medical assistance to first responders by opening a treatment facility on the Property.

56.     The Property is an approximately 20-acre site with buildings and dormitories designed to serve as residences for up to 30 people.  The Property was originally not subject to zoning law, and it was used by a convent by the Order of St. Helena Convent for over 40 years until they moved from the Property to North Augusta in approximately 2014.  After sitting for many years on the market, the property was sold in October of 2017 to the Hale Foundation.

57.     The former convent, shown below, is contained within 20 acres of forest and is bounded to the south by Bobby Jones Expressway, to the West by Augusta Technical College, to the east by the Green Meadows golf course, and to the north by the Green Meadows subdivision. It is ideally suited for Plaintiff's proposed rehabilitation center, and practically speaking for not much else.



58.    It already contains the dormitories, meeting rooms, and commercial kitchen facilities to support the mission of the Hale Foundation.   Since the nuns vacated the Property, the only proposed uses for it have been (a) a monastery, (b) a rehabilitation center for troubled youth, and (c) the Hale Foundation's proposed rehabilitation center.   The Property is not suited for single family use, and its present zoning designation without special exception renders it valueless.

59.    On July 29, 2015, Westcare Georgia, Inc., filed an application for special exception for the Property to operate a residential vocational and educational facility to provide therapy for behavioral and substance abuse treatment.   Westcare selected the Property as an ideal location to move its Keysville, Georgia operation because the Property is secluded, wooded, set up for dormitory living, and ideally situated for such a use.   The neighbors of the Green Meadows

subdivision opposed the use by Westcare, and so it subsequently withdrew its application.  A true and accurate copy of the documents pertaining to its application are attached hereto as Exhibit "F."

60.     On May 31, 2017, the Monks of Mt. Tabor filed an application for special exception to permit the Property to be used as a monastery.   It proposed to use the facility as living quarters for monks, and to welcome the public for retreats and worship on the Property.  The Defendant approved the application for special exception, but the Monks ultimately could not consummate their purchase of the Property.  A true and accurate copy of the documents pertaining to its application are attached hereto as Exhibit "G."

61.     In response to the increasing need for safe, effective residential treatment facilities for those seeking to recover from drug and alcohol addiction, Hale Foundation acquired the Property with the plan to develop a residential alcohol and substance abuse treatment facility on the Property. The facility would be called "Valor Station" and would serve as a licensed residential rehabilitation center for first responders suffering from addiction.

62.     The existing facilities and setting are ideally suited for use as a rehabilitation center.

63.     The existing facilities include numerous meeting rooms, worship rooms, a dining hall, a commercial-grade kitchen, and dormitory. The facilities collectively occupy only a small portion of the 20-acre property, which otherwise consists of undeveloped forested space.

64.     The facility is located in the center of the property and is very private. It is set back from the roadway, and it will be separated from the Green Meadows subdivision by a solid wall, with vegetative buffering and no access from the Green Meadows roadways. The property is surrounded by acres of forest preserve on the West, South and East.

65.     The facilities are shielded from view by any of the adjoining roads.

66.     Because of its isolated location, the design has and would minimize any impact the facility otherwise might have on the surrounding community.

### The Augusta Zoning Ordinance and Application Procedures

67.     Augusta, Georgia has adopted a Comprehensive Zoning Ordinance (the "Ordinance"), which is attached hereto as Exhibit "H."

68.     Pursuant to the Comprehensive Zoning Ordinance, the Property is presently zoned as R-1 (One-Family Residential) Zone, even though it was not constructed, intended to be used, or actually ever used as a single-family residence.

69.     The Ordinance enumerates certain uses which an applicant may propose to the County Commission for classification as a "special exception."

70.     Ordinance Section 26-1 provides that Special Exceptions, including drug and alcohol treatment facilities, may be permitted in any Zone where such uses are deemed desirable to the public convenience or welfare and are in harmony with the various elements or objectives of the Master Plan/Planning Document in effect.

71.     Pursuant to the Ordinance Section 35-9.1: When a proposed zoning decision relates to or will allow the location or relocation of a halfway house, drug rehabilitation center, or other facility for treatment of drug dependency, a public hearing shall be held on the proposed action. Such public hearing shall be held at least six (6) months and not more than nine (9) months prior to the date of final action on the zoning decision. The hearing required by this subsection shall be in addition to any hearing required under subsection (a) of this Code section.

72.     The Ordinance does not mention or acknowledge that Augusta is obligated to comply with the requirements of the FHA or ADA.

73.     In the ordinary course, an application a "special exception" is first considered by Augusta's Planning Department.  If a public hearing is required, it is held by the Planning Department, following by the waiting period required in the Ordinance.  The application is then heard by the County's Planning Commission, which makes a recommendation for approval or denial to the Augusta Commission.

74.     All documents pertaining to the Hale Foundation's Application for Special Exception are attached hereto as <u>Exhibits B through D</u>.

**<u>Plaintiff's Request for a Special exception Met All Requirements of the Zoning Ordinance</u>**

75.     The Petitioner's Special Exception Application was presented to and approved by the 10-person Planning Commission on or about August 3, 2020, with the following stipulations:

    a. The Special Exception for this property is for an alcohol, drug and post-traumatic stress disorder treatment facility for first responders only. If the clientele or treatment program changes, the applicant/owner must apply for a new Special Exception.

    b. Final approval of this project is contingent on obtaining an easement, in writing, from the State of Georgia to provide driveway access to the property from Augusta Tech Drive. All egress and ingress to this property is to be through this driveway.

    c. A privacy fence consisting of solid wood board six feet in height shall be installed along the east boundary line of the property at Augusta Tech Drive to head south +/- 1,772 feet to Eagle Drive, continue across Eagle Drive and follow the southern property boundary along 3038 Eagle Drive, 3040 Eagle Drive and 2900 Green Meadows Drive. Access from Eagle Drive is for emergencies only. A 50-foot

vegetative buffer shall be installed along the fence line except where emergency access is provided.

d.  Any expansion, additions or alterations to the property must comply with all development standards and regulations set forth by the City of Augusta, and must receive site plan approval prior to any changes.

A true and accurate copy of the Planning Commission's Approval is attached hereto as Exhibit "C."

76.     Residents who vocally opposed the application did so simply because the facility sought to treat individuals seeking to recover from drug and alcohol addiction.  There was no other grounds to object to the treatment facility.

77.     Although the manifest weight of the evidence overwhelmingly supported the approval of Plaintiff's special exception application, irrational fear and discrimination against disabled individuals seeking to recover from drug and alcohol addiction dominated the hearings before both the Planning Commission and the Augusta Commission.

78.     For example, the primary concern of residents was for safety, security, and property values, although there is no evidence that the proposed use by the Hale Foundation will cause any diminishment of safety, security, and property values.  They refer to the Hale Foundation as a "contrary business."

79.     One neighbor testified at the August 28, 2020 hearing that, "We will not have our safety, our security, we will be nervous because we do not know what is going on back there.  They may put in precautions … but you never know what is going to happen."  He further stated, "We do not want our grandchildren to feel that they cannot play in the road because there is someone coming down the street from the treatment center."

80.     Another resident referenced a fear of finding a person on her porch in the middle of the night or in her pool in the morning.  These are irrational, unfounded and discriminatory fears that cannot serve as a basis for excluding a voluntary residential treatment facility from opening.

81.     No resident provided any logical or evidence-based reasoning for the disapproval of the special exception application, other than the discriminatory grounds that they do not want a drug and alcohol treatment facility in their back yard.  This is no different under the law than objecting to the Hale Foundation's use based upon the color or race of its proposed patients.

82.     There was absolutely no objection to the number of residents, the activities to be conducted on the property, the noise, the smell, the increased traffic, or to any other objective, non-discriminatory criteria that could serve as a basis to deny the Special Exception Application.

83.     The commissioners who voted against the Hale Foundation similarly did not provide any logical or evidentiary grounds to deny the application.  Instead, they simply indicated that they would cast their votes according to the wishes of the residents of Green Meadows (even if they had not non-discriminatory objections), which wished were clearly based entirely on discriminatory grounds.

84.     Commissioner Ben Hasan went so far as to declare that the Commissioners would stand with the wishes of the neighborhood "regardless of whether it was a good project or a great project."

85.     He indicated that he would support a neighborhood's objection simply because it does not want an activity in its neighborhood (even if the reasoning is based on discriminatory grounds).

86.     Commissioner William Fennoy similarly explained that he would cast his vote based solely upon the wishes of the neighborhood.  Since there was no non-discriminatory grounds

put forward by the neighborhood to oppose the Special Exception Application, this means his vote was based purely on discriminatory objections to a protected class of patients who would utilize the Hale Foundation's services.

87.     However, as Commissioner Marion Williams explained, the Hale Foundation does not have a history of a single safety concern arising from its existing facilities in Augusta, Georgia. Hence, the fear and concerns asserted by the residents of Green Meadows arise simply from unsupported, discriminatory views of the Hale Foundation and its patients.

88.     Commissioner Brandon Garrett explained that the Hale House has met every condition put to it by the County, but the goal post keeps getting moved by Augusta.  This is because of Augusta's desire to keep the Hale Foundation out of the Property, even though there is no remaining non-discriminatory reason to do so.

89.     Augusta's actions of moving the goal post over the past three years are acts of discrimination for which Plaintiff seeks a remedy in this court.

## COUNT I – VIOLATION OF THE FAIR HOUSING ACT
### 42 U.S.C. § 3601, et seq.

90.     Paragraphs 1 through 89 above are incorporated by reference as if fully set forth herein.

91.     The Fair Housing Act ("FHA," and sometimes referred to as the "Fair Housing Amendments Act," or "FHAA"), 42 U.S.C. § 3601 et seq., guarantees fair housing to handicapped individuals.

92.     Under the FHA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such impairment, or being regarded as having such an impairment." 42 U.S.C. § 3602(h).

93.     The term "physical or mental impairment" includes "alcoholism" and "drug addiction (other than addiction caused by current, illegal use of a controlled substance)." 24 C.F.R. § 100.201.

94.     Hale Foundation's patients are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12101.

95.     Under the FHA, it is unlawful to discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that buyer, renter, or person residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1).

96.     The proposed residential buildings within the rehabilitation center qualify as dwellings under the FHA.

97.     Defendant has violated, and is continuing to violate, the FHA by, among other things:

    a.  Allowing official and community prejudice against Hale Foundation's disabled patients to dictate the outcome of the zoning hearings;

    b.  Discriminating against Plaintiff and the disabled patients that Hale Foundation is committed to serve;

    c.  Denying the requested special exception because of the disabled status of the residents that the proposed facility would house and treat; and

    d.  Refusing to engage in a reasonable accommodation analysis in connection with their denial of Plaintiff's special exception application.

98.     Defendant's arbitrary and discriminatory policies in respect to, and interpretation of, the Augusta Zoning Ordinance have also had a disparate impact on those suffering from addiction, including Hale Foundation's disabled patients, in several ways that are unlawful under the FHA. These include, among others:

a.  By allowing special exceptions for this Property for multi-family uses, but not allowing residential facilities for the treatment of substance abuse and addiction on the same Property, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction; and

b.  By utilizing its Zoning Ordinance to impose, and interpreting its Zoning Ordinance to require, onerous conditions on facilities for the treatment of addiction that are not imposed upon other permitted special exceptions, such as the convent that operated on this Property for 40 years, or the monastery that proposed to operate on the Property, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction.

99.     In addition, Defendant violated the FHA's reasonable accommodation requirement. The FHA prohibits "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Despite Plaintiff's repeated requests for a reasonable accommodation throughout the zoning hearings, Defendant failed to provide reasonable accommodations for Hale Foundation's disabled patients.

100.    Defendant has failed to make reasonable accommodations to Plaintiff and Hale Foundation's patients in several ways by, among other things:

a.  Imposing onerous requirements and other conditions on the facility's operation that are not required of other, similar special exceptions;

b.  Failing to permit the facility to operate in the identical manner as the conventit would replace solely because of the disabled status of the patients the facility would house and treat;

c.  Denying Plaintiff's special exception application in part on the stated but unsupported ground that, due to the public stigma associated with those suffering from addiction, the proposed facility would result in a reduction in property value for a nearby residents, without considering Plaintiff's contrary evidence, or evaluating whether any risk of such a decline could be reduced or eliminated by conditions placed on Plaintiff or by other measures, or whether the overall benefits to the health and welfare of the community provided by the facility outweighed any such risk; and

     d.   Voting to deny Plaintiff's application even after Hale Foundation agreed to all of Augusta's recommended conditions for the approval of the special exception, all of which were recommended by the Planning Commission to address Defendant's concerns regarding the proposed facility.

101.    Plaintiff and Hale Foundation's patients have suffered, and continue to suffer, substantial damages and other harm as a result of Defendant's unlawful conduct.

## COUNT II – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12102, et seq.

102.    Paragraphs 1 through 89 above are incorporated by reference as if fully set forth herein.

103.    The Americans with Disabilities Act ("ADA") provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of any service, program, or activity of a public entity, or be subjected to discrimination by any such entity. The ADA also makes it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

104.    Hale Foundation's patients are qualified persons under the ADA with disabilities that substantially impair one or more major life activities.

105.    The first criteria for admission to the treatment facility for patients will be that the patient has been diagnosed as suffering from drug or alcohol addiction and has agreed to participate in substance abuse treatment. As part of this requirement, Hale Foundation's medical personnel must determine that the patient is suffering from drug or alcohol addiction to such a degree that he or she is unable to care for him- or herself.

106.    While being treated at the facility, Hale Foundation's patients will not be illegally using controlled substances. As such, Hale Foundation's patients are "qualified persons with disabilities" within the meaning of the ADA. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.104.

107.    Defendant are qualifying public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(A).

108.    Section 12132 of the ADA constitutes a general prohibition against discrimination on the basis of disability by public entities.

109.    Defendant has violated, and are continuing to violate, the ADA by, among other things:

    a.  Allowing official and community prejudice against Hale Foundation's disabled patients to dictate the outcome of the zoning hearings;

    b.  Discriminating against Plaintiff and the disabled patients that Hale Foundation is committed to serve;

    c.  Denying the requested special exception because of the disabled status of the residents that the proposed facility would house and treat;

    d.  Imposing, or seeking to impose, discriminatory conditions upon Plaintiff solely because of the disabled status of the residents that the proposed facility would house and treat; and

    e.  Refusing to engage in a reasonable accommodation analysis in connection with their denial of Plaintiff's special exception application.

110.    Defendant's arbitrary and discriminatory policies in respect to, and interpretation of, the Augusta Zoning Ordinance have also had a disparate impact on those suffering from addiction, including Hale Foundation's disabled patients, in several ways that are unlawful under the ADA. These include, among others:

    a.  By allowing other similar facilities to operate on the Property and in the R-1 Zoning District, but not allowing residential facilities for the treatment of substance abuse and addiction in those same districts, Defendant's interpretation and enforcement

of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction; and

b. By utilizing its Zoning Ordinance to impose, and interpreting its Zoning Ordinance to require, onerous conditions on facilities for the treatment of addiction that are not imposed upon other permitted special exceptions, such as the convent that operated on this site for 40 years, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction.

111.   In addition, Defendant violated the ADA's reasonable accommodation requirement. The ADA provides: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Despite Plaintiff's repeated requests for a reasonable accommodation throughout the zoning hearings, Defendant failed to provide reasonable accommodation for Hale Foundation's disabled patients. Moreover, Defendant cannot demonstrate that accommodating Plaintiff and Hale Foundation's patients would fundamentally alter the nature of the Augusta Zoning Ordinance.

112.   Defendant has failed to make reasonable accommodations to Plaintiff and Hale Foundation's patients in several ways by, among other things:

a. Imposing onerous security requirements and other conditions on the facility's operation that are not required of other, similar special exceptions;

b. Failing to permit the facility to operate in the identical manner as the boarding school it would replace solely because of the disabled status of the patients the facility would house and treat;

c. Denying Plaintiff's special exception application in part on the stated but unsupported ground that, due to the public stigma associated with those suffering from addiction, the proposed facility would result in a reduction in property value for a nearby residential homeowners, without considering Plaintiff's contrary evidence, or evaluating whether any risk of such a decline could be reduced or eliminated by conditions placed on Plaintiff or by other measures, or whether the

overall benefits to the health and welfare of the community provided by the facility outweighed any such risk; and

d.   Voting to deny Plaintiff's application even after Hale Foundation agreed to all of Augusta's recommended conditions for the approval of the special exception, all of which were supposedly recommended by the Planning Commission to address Defendant's concerns regarding the proposed facility.

113.   Plaintiff and Hale Foundation's patients have suffered, and continue to suffer, substantial damages and other harm as a result of Defendant's unlawful conduct.

## COUNT III – VIOLATION OF THE REHABILITATION ACT
## 29 U.S.C. § 791, et seq.

114.   Paragraphs 1 through 89 above are incorporated by reference as if fully set forth herein.

115.   The Rehabilitation Act, 29 U.S.C. § 791, et seq., provides that no qualified individual with a disability shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

116.   Augusta receives federal financial assistance, including through federal grant programs such as the Community Development Block Grant program, which is funded by the United States Department of Housing and Urban Development.

117.   Section 508 of the Rehabilitation Act defines "program or activity" as "all of the operations" of specific entities, including "a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

118.   Defendant are qualifying public entities within the meaning of the Rehabilitation Act.

119.   Zoning decisions by a municipality are normal functions of a governmental entity and thus are covered by the Rehabilitation Act.

120.    Hale Foundation's patients are qualified persons under the Rehabilitation Act with disabilities that substantially impair one or more major life activities. See 29 U.S.C. §705(9)(B); 42 U.S.C. § 12102.

121.    The first criteria for admission to the treatment facility for patients will be that the patient has been diagnosed as suffering from drug or alcohol addiction and has agreed to participate in substance abuse treatment. As part of this requirement, Hale Foundation's medical personnel must determine that the patient is suffering from drug or alcohol addiction to such a degree that he or she is unable to care for him- or herself.

122.    While being treated at the facility, Hale Foundation's patients will not be illegally using controlled substances. As such, Hale Foundation's patients are "qualified persons with disabilities" within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(2); 28 C.F.R. § 35.104.

123.    Section 508 of the Rehabilitation Act constitutes a general prohibition against discrimination on the basis of disability by public entities.

124.    Defendant has violated, and is continuing to violate, the Rehabilitation Act by, among other things:

      a.  Allowing official and community prejudice against Hale Foundation's disabled patients to dictate the outcome of the zoning hearings;

      b.  Discriminating against Plaintiff and the disabled patients that Hale Foundation is committed to serve;

      c.  Denying the requested special exception because of the disabled status of the residents that the proposed facility would house and treat; and

      d.  Imposing, or seeking to impose, discriminatory conditions upon Plaintiff solely because of the disabled status of the residents that the proposed facility would house and treat; and

      e.   Refusing to engage in a reasonable accommodation analysis in connection with their denial of Plaintiff's special exception application.

125.    Defendant's arbitrary and discriminatory policies in respect to, and interpretation of, the Augusta Zoning Ordinance have also had a disparate impact on those suffering from addiction, including Hale Foundation's disabled patients, in several ways that are unlawful under the Rehabilitation Act. These include, among others:

      a.   By allowing other similar facilities to operate on the Property and in the R-1 Zoning District, but not allowing residential facilities for the treatment of substance abuse and addiction in those same districts, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction; and

      b.   By utilizing its Zoning Ordinance to impose, and interpreting its Zoning Ordinance to require, onerous conditions on facilities for the treatment of addiction that are not imposed upon other permitted special exceptions, such as the convent that operated on this site for 40 years, Defendant's interpretation and enforcement of its Zoning Ordinance has a disparate impact on those suffering from the disability of addiction.

126.    In addition, Defendant violated the Rehabilitation Act's reasonable accommodation requirement. The Rehabilitation Act prohibits a government entity from refusing to modify an existing program or to make reasonable accommodations to the disabled where to do so would render the program unreasonable or discriminatory. Despite Plaintiff's repeated requests for a reasonable accommodation throughout the zoning hearings, Defendant failed to provide or make any efforts toward a reasonable accommodation for the Hale Foundation's disabled patients.

127.    Defendant has failed to make reasonable accommodations to Plaintiff and Hale Foundation's patients in several ways by, among other things:

      a.   Imposing onerous security requirements and other conditions on the facility's operation that are not required of other, similar special exceptions;

      b.   Failing to permit the facility to operate in the identical manner as the boarding school it would replace solely because of the disabled status of the patients the facility would house and treat;

    c.   Denying Plaintiff's special exception application in part on the stated but unsupported ground that, due to the public stigma associated with those suffering from addiction, the proposed facility would result in a reduction in property value for a nearby residential homeowners, without considering Plaintiff's contrary evidence, or evaluating whether any risk of such a decline could be reduced or eliminated by conditions placed on Plaintiff, or by other measures, or whether the overall benefits to the health and welfare of the community provided by the facility outweighed any such risk; and

    d.   Voting to deny Plaintiff's application even after Hale Foundation agreed to all of Augusta's recommended conditions for the approval of the special exception, all of which were recommended by the Planning Commission to address Defendant's concerns regarding the proposed facility.

128.    Plaintiff and Hale Foundation's patients have suffered, and continue to suffer, substantial damages and other harm as a result of Defendant's unlawful conduct.

### COUNT IV – VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION— SUBSTANTIVE DUE PROCESS—and 42 U.S.C. § 1983

129.    Paragraphs 1 through 89 above are incorporated by reference as if fully set forth herein.

130.    Defendant's denial of Plaintiff's application for a special exception violated Plaintiff's right to substantive due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution by arbitrarily, irrationally, and unreasonably interfering with Plaintiff's right to sell, purchase, use and develop the property and associated facility.

131.    Defendant's illegal and improper actions are not roughly proportional to the public good sought to be achieved and are grossly disproportionate to any asserted public interest because they unduly deprive Plaintiff and its patients of their constitutional rights far beyond what is reasonable, legal or necessary.

132.    Defendant's actions are illegal because they prevent, frustrate, and impede Plaintiff's by-right use and enjoyment of the property and its facilities, in violation of the Fifth Amendment to the United States Constitution.

133.    Defendant's actions deprived Plaintiff of a legally permitted, economically beneficial use of the property.

134.    Defendant's conduct was arbitrary, capricious, unreasonable, malicious, discriminatory, in bad faith, and shocks the conscience.

135.    Defendant's actions violate the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiff is entitled to vindicate these rights pursuant to 42 U.S.C. § 1983.

136.    Plaintiff and Hale Foundation's patients have suffered, and continue to suffer, substantial damages and other harm as a result of Defendant's unlawful conduct.

## V.    <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff respectfully request that the Court enter judgment in its favor and against Defendant, jointly and severally, on Counts I-IV, above, and grant the following relief:

(i)     A declaration that Defendant's improper denials of Plaintiff's application for a special exception constituted violations of the FHA, ADA, Rehabilitation Act, and Fifth and Fourteenth Amendments to the United States Constitution, and that Hale Foundation and its patients are entitled to reasonable accommodations to facilitate the operation of the rehabilitation center as proposed in Plaintiff's application;

(ii)    Preliminary and permanent injunctive relief permitting Hale Foundation's operation of the rehabilitation center, as proposed in Plaintiff's application, and enjoining Defendant from obstructing or interfering with Hale Foundation's operation thereof;

(iii)   Compensatory damages;

     (iv)     Punitive damages;

     (v)     Attorneys' fees and costs; and

     (vi)     Such other relief as the Court deems appropriate.

## VI.    **JURY DEMAND**

Plaintiff respectfully request a trial by jury on all claims so triable.

Respectfully submitted, this 7th day of October, 2020.

                  /s/ Christopher A. Cosper
                  Christopher A. Cosper
                  Georgia Bar No. 142020
                  HULL BARRETT PC
                  801 Broad Street, Suite 700
                  Augusta, Georgia 30901
                  (t) 706/722-4481
                  (f) 706/722-9779
                  (e) ccosper@hullbarrett.com